# UNITED STATES DISTRICT COURT
## DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                      Plaintiff,<br><br>     vs.<br><br>RONALD ALLEN DOWNEY,<br><br>                    Defendant. | 3:20-cr-00076-RRB-MMS-1<br><br>**REPORT AND RECOMMENDATION**<br>**ON PETITION [110]** |

In May of 2019, the United States District Court for the Western District of Missouri entered the following judgment against Ronald Allen Downey ("Downey"): (1) a time-served imprisonment term for federal tax evasion; (2) a three-year term of supervised release; and (3) a restitution order in the amount of $94,688.[1] In August of 2020, United States Probation Officer ("USPO") Benjamin Schmidt ("USPO Schmidt") petitioned the Court to revoke Mr. Downey's supervised release for failure to make restitution payments and for failure to reside at an approved residence. This Court heard testimony and took evidence, and it recommended that the district judge find that Mr. Downey had violated the condition of his release pertaining to making restitution payments.[2] The Court adopted

---

[1] *See generally*, Dkt. 1-1 (Judgment).
[2] *See, generally*, Dkt. 65 (Final Report and Recommendation).

that recommendation and ordered Mr. Downey be sentenced to time served and that he be subject to 24 months of supervised release.[3]

In October of 2023, USPO Schmidt again petitioned the Court to revoke Mr. Downey's supervised release. Dkt. 110 (the "Petition"). The Petition enumerated four alleged violations. First, that Downey had failed to "apply for the Alaska Permanent Fund Dividend (PFD) and shall apply the PFD toward any outstanding restitution or fine owed in this case" in 2023. *Id.* at 1. Second, that Mr. Downey, on multiple occasions, had failed to provide the USPO the proper documentation at least seven days in advance before traveling outside of the District. *Id.* Third, that Mr. Downey had failed to make his restitution payments of at least $100.00 or 10% of his gross income monthly. *Id.* at 2. Fourth, that Downey, on multiple occasions, had traveled outside of the District without obtaining authorization from the USPO. *Id.*

Mr. Downey has elected to proceed pro se, though Mr. Muse has assisted in the capacity of hybrid counsel for this Court's benefit.[4] This Court held evidentiary proceedings over the course of four non-consecutive days.[5] While Mr. Downey had questioned and cross-examined witnesses in a leading way that indicated his positions on various matters, he did not himself testify. As such, while this Court issues its recommendation with his positions in mind, it does not consider his questioning to be evidence for the record as his testimony. Upon consideration of the testimony heard therein

---

[3] Dkts. 66 and 82–83.
[4] Mr. Muse's work on behalf of Mr. Downey, both as assigned counsel, and later as stand-by counsel, has been zealous, thorough, and patient.
[5] Dkts. 157, 175, 228, 240.

2

and the admitted exhibits, this Court hereby makes its Report and Recommendation that the district judge find that Mr. Downey has violated his conditions of release as detailed in the Petition. 28 U.S.C. § 636(b)(1)(B). This Court does not make a recommendation as to the judgment to be imposed pursuant to this finding.

## I.    EVIDENTIARY PROCEEDINGS

**First Day of the Evidentiary Proceedings**

On the first day of the evidentiary hearing proceedings, this Court heard from USPO Timothy M. Astle ("USPO Astle"), USPO Schmidt, and Special Agent Brock Kinsler ("SA Kinsler"), each called by the government. *See generally*, Dkt. 159. It also heard from Federal Public Defender Paralegal Mark Heinrichs, called by Mr. Downey. *Id.*

USPO Astle testified that although he was not Mr. Downey's assigned supervising officer, he had assisted with supervising Mr. Downey when USPO Schmidt was unavailable. *Id.* at 4:23–5:6. In this capacity, USPO Astle had reviewed Mr. Downey's conditions of release with him and testified that he specifically had advised Mr. Downey on the special conditions. *Id.* at 6:15–7:9. This included the payment schedule, which ordered Mr. Downey to pay in "monthly installments[.]" *Id.* at 7:10–8:4; Government Exhibit ("G-") 1 at 7; *see also*, G-2 (unsigned standard form for restitution payments). USPO Astle also testified to having received travel requests from Mr. Downey, including one for travel beginning January 18 to February 8,[6] which was denied for non-compliance

---

[6] G-3.

with the condition that the request be made at least seven days in advance and because he was unable to verify important information. Dkt. 159 at 13:23–14:16.

USPO Schmidt, Mr. Downey's primary supervisor, also testified. He testified that he had met with Mr. Downey to discuss his requirement to apply for the PFD.[7] USPO Schmidt also testified as to Mr. Downey's requirement to pay restitution, which he discussed with him as well. *Id.* at 44:2–4. USPO Schmidt "reinstructed [Downey] several times, as [he] noticed no payments were made." *Id.* at 44:6–7. However, the periodic payments that were made were not made to the Clerk of Court in violation of the condition of release despite being advised to do so. *Id.* at 44:22–45:11; G-26. He also testified that he did not discuss prepayment with a lump sum with Mr. Downey and that he never would have authorized it because the condition required monthly installments. Dkt. 159 at 47:10–19.

The government also called SA Kinsler with the I.R.S. He testified to serving process on Alaska Airlines for preservation of, and request for, Mr. Downey's flight records. *Id.* at 60:21–61:1; *see also* G-28 and G-29. His testimony on the contents of Alaska Airline records was continued for authentication purposes. *Id.* at 69:12–19.

Downey called Mr. Heinrichs, who testified to authenticate an exhibit reflecting that Mr. Downey had applied for the PFD. *Id.* at 71:22–77:23.

//

//

---

[7] Dkt. 159 at 31:24–32:7.

**Second Day of the Evidentiary Proceedings**

On the second day of the evidentiary hearing, this Court heard from Corey Bigelow, a PFD operations manager, and agan from SA Kinsler and USPO Schmidt. *See generally*, Dkt. 200. Mr. Bigelow had reviewed Mr. Downey's 2023 PFD application. *Id.* at 6:19–22. He explained that the PFD application required certain information to ensure compliance with Alaska's eligibility requirements, such as detailing when an applicant was out of state if they were out of state for more than 90 days, and listing two Alaska residents who could verify the applicant's residency. *Id.* at 8:4–15. Downey failed to include this information. *Id.* In May of 2022, Mr. Downey called the PFD office and spoke with a technician. The office sent Mr. Downey a request for this information after explaining these deficiencies. *Id.* at 8:16–18, G-31. A recording of the call was authenticated and provided as G-31. While only portions of the exhibit were played during the hearing, this Court has separately listened to the entirety of the exhibit and describes it below as appropriate.

SA Kinsler testified again to authenticate and describe the Alaska Airlines records. He spoke to how G-30, an explanatory exhibit with straightforward comments alongside sample records, can assist in reviewing the actual records provided by Alaska Airlines.[8] The Court admitted the flight records at G-5, 8, 11, 13, 15, 17–18, 20, 22–23 and 25. Dkt. 200 at 23:12.

---

[8] Dkt. 200 at 20:13–22:8; *see also*, G-5.

USPO Schmidt testified again. He testified that G-6 represented an approved travel request for February 11 to 14 and February 18 to 21, 2023. *Id.* at 31:25–32:23. He also testified that G-7 (also including March 4 to 7) represented a travel request that was not approved for lack of itinerary documentation, but he had been unable to speak with Mr. Downey about it. *Id.* at 34:17–35:14. USPO Schmidt testified that he had not known prior to reviewing the records that Mr. Downey had traveled to Maui from March 5 to 9, 2024 (G-8). *Id.* at 36:2–17. He testified that G-9 represents a travel request for March 11 to 14 and March 18 to 21 that was not approved. *Id.* at 36:22–37:3. USPO Schmidt said that he again could not get in touch with Mr. Downey and had left him a voicemail. *Id.* at 37:15–25. G-10 was a travel request form for March 24 to 29. *Id.* at 39:12–13. Due to Mr. Downey providing the request only 5 minutes before the end of the workday, USPO Schmidt did not have time to speak with him about the request, but he never gave Downey approval. *Id.* at 39:14–40:7. G-11 reflects the request that was not approved in G-10. *Id.* at 40:8–22. This process was repeated several times, reflecting several unapproved trips.[9] Downey cross-examined USPO Schmidt regarding his chronologies (or "chronos") that he

---

[9] Requested trip: April 7 to April 19 (G-12) that was denied (Dkt. 200 at 41:6–23) but a longer trip was taken from April 3 to May 4 (G-13). Dkt. 200 at 42:10–15. Requested trip: May 26 to June 6 (G-14) that was denied due to a petition to revoke his supervised release being filed (Dkt. 200 at 47:15–22) but was taken from May 28 to June 12 (G-15). Dkt. 200 at 48:12–16. Requested trip: June 22 to July 6 to Montana (G-16, including tickets between Anchorage and Montana) that was approved (Dkt. 200 at 49:8–10) but was taken from June 22 to July 7, including an unapproved 3-day stay in Phoenix, Arizona (G-18). Dkt. 200 at 50:9–51:25. Requested trip: July 13 to August 14 (G-19) that was not approved (Dkt. 200 at 52:19–53:5) but was taken anyway until August 25 (G-20). Dkt. 200 at 53:17–21. Requested trip: September 28 to October 19 (G-21) that was denied for failure to submit proper documentation (Dkt. 200 at 53:23–54:5) but Downey traveled from September 2 to November 22 to multiple locations (G-22, G-23). Dkt. 200 at 54:17–55:16.

used to refresh his recollection for specific dates and interactions. This is detailed further below.

### Third Day of the Evidentiary Proceedings

On the third day of the hearing, this Court heard from Jordan Harary ("Harary"), Mr. Downey's friend who houses him for no compensation. Mr. Harary testified to following Mr. Downey on matters of faith and religion. He also testified as to a few matters in which he perceived religious discrimination against Mr. Downey. Dkt. 237 at 7:10–25 (testifying that he overheard USPO Astle refer to Downey as "not a real Christian" when meeting with Mr. Downey.). He also testified that he overheard a conversation between AUSA Ivers and SA Kinsler about wanting "to get" Downey, generally. *See, e.g., id.* at 10:3–11:5. AUSA Ivers questioned Harary about his arrangement with Mr. Downey for the purposes of determining restitution, which then elicited testimony during cross-examination in redirect regarding the details of his and Downey's private religious beliefs. This Court will not summarize the extensive discussion on this topic because it does not find these details to be relevant to the allegations or defenses.

### Fourth Day of the Evidentiary Proceedings and Post-Hearing Briefs

On the fourth and final day of the evidentiary hearing proceedings, this Court heard briefly again from SA Kinsler and Harary. *See generally*, Dkt. 245. SA Kinsler testified to clarify that any comments that Harary overheard regarded winning a case, but not specifically Mr. Downey's. *Id.* at 9:16–10:19. Harary testified again, disagreeing with SA Kinsler's testimony. *Id.* at 16:12–23. This Court ordered post-hearing briefing for closing argument, which the parties filed. Dkts. 246–47.

7

The government argued that it had substantiated its case by at least a preponderance of the evidence as to each alleged violation. *See generally*, Dkt. 246. It argued that Mr. Downey did not apply for the PFD in good faith, that he failed to provide proper travel documentation and failed to obtain USPO permission before traveling on several occasions, and that he failed to make restitution because paying a lump sum was not approved, and further, that the payments Downey did make were motivated to benefit himself, rather than to comply with this condition of release. *Id.* at 3–12. Downey argues that he complied with the condition that he applied for the PFD, that he had provided the necessary travel information, that he satisfied his restitution requirement by prepaying $1,200, and that the government has not demonstrated that he traveled without permission, challenging the authenticity of the government's exhibits. Dkt. 247 at 2–6. He further argued that he should have been able to obtain the chronological records from USPO Schmidt, that his conditions of release conflicted with each other, that the Alaska Airlines records are without foundation, and that he has faced religion-based discrimination throughout his interactions with the federal courts dating back to his proceedings in Missouri. *Id.* at 7–10.

## II.   DISCUSSION

The government has the burden to show that Mr. Downey violated his conditions of release by a preponderance of the evidence.[10] This is a far lower standard than the typical criminal standard of beyond a reasonable doubt. Instead, the government must only show

---

[10] 18 U.S.C. § 3583(e)(3); *United States v. Turner*, 312 F.3d 1137, 1142 (9th Cir. 2002).

that it is "more likely than not" that Downey has committed these violations.[11]  Because

the government has submitted a plethora of evidence and testimony on each allegation of

a violation, and because Mr. Downey has not effectively rebutted that record, the

government has shown that it is more likely than not that Mr. Downey committed the

following violations.

### a. Mr. Downey's Violations.

Upon recollection of the evidentiary proceedings, a review of the transcripts and

exhibits, and consideration of the briefs filed by the parties, this Court believes that the

government has fulfilled its burden to establish by a preponderance of the evidence that

Mr. Downey violated his conditions of release as detailed in the Petition.

1. <u>Mr. Downey Failed to Apply for the PFD and Apply the Proceeds to His Outstanding Debt to the United States.</u>

Mr. Downey has not complied with Special Condition of Supervision 3 in good

faith.  The condition reads, "[d]uring the term of supervision, the defendant shall, while

eligible, apply for the Alaska Permanent Fund Dividend (PFD) and shall apply the PFD

toward any outstanding restitution or fine owed in this case."[12]  There is no dispute that

Downey had in fact applied for his PFD in 2023.  However, his application was not

successful.  The record reflects that both USPO Astle and USPO Schmidt informed Mr.

Downey of his release conditions and USPO spoke specifically to reviewing his obligation

to apply to the PFD.[13]

---

[11] *United States v. Smith*, 206 F. App'x 660, 661 (9th Cir. 2006).
[12] Dkt. 87 at 5.
[13] Dkt. 159 at 6:17–8:7, 31:24–32:7; Dkt. 200 at 34:2–6.

There were issues with Mr. Downey's application. He did not provide Alaska with dates that he was absent from the state, nor did he list two verifiers.[14] Downey had called the PFD office to confirm receipt and spoke with a technician. G-31. He and the technician extensively talked about these two deficiencies, and the technician sent a request for additional information to Downey and explained on the call which information he needed.[15] On the call, Downey repeatedly asked for verification that he had applied, and while he spoke with the technician about the deficiencies, the audio recording of the call reflects that Downey's primary motivation was verification, not that the application would be successful. *See generally*, G-31. This is highlighted by him not responding to the request for more information, which led to the ultimate denial of his application.[16]

Downey argues that he literally complied with this special condition.[17] The government argues that his incomplete application was a knowing circumvention of his obligation.[18] This Court agrees with the government. The purpose of this condition is to contribute to Downey's near six-figure debt after defrauding the United States. This Court is not persuaded that the district judge directed him to apply to the PFD as a matter of formality. Downey failing to respond to the letter requesting additional information after having the technician explain to him, very politely, how he failed to follow the application's basic directions, evidences bad faith. This Court is aware of the tedium that

---

[14] Dkt. 200 at 8:4–15; G-31.
[15] Dkt. 200 at 12:5–13, 13:9–11, at 8:17–18.
[16] *Id.* at 12:1–12.
[17] Dkt. 247 at 2–3.
[18] Dkt. 246 at 5.

is often involved with applying for the PFD. It is also aware that thousands for Alaskans successfully apply for, and receive, the PFD every year. The necessary safeguards that the state has implemented are not so onerous for Downey to have not been able to comply with the Court's condition that he apply for it and furnish the proceeds to the United States. His actions in 2023 have deprived the United States from moneys that it is owed.

By a preponderance of the evidence, this Court finds Downey's actions to constitute knowing violation of the Court's Special Condition of Release 3.

### 2. Mr. Downey Failed to Make Monthly Restitution Payments.

Mr. Downey has not complied with Special Condition 5. The condition reads, "[d]uring the period of supervised release, the defendant shall pay any fine or any restitution in accordance with the Court's orders of at least $100.00 a month or 10% of the defendant's gross income, whichever is greater."[19] The Petition alleges that Downey has not made payments since January of 2023.[20] Downey argues that he paid his restitution in advance with a one-time payment of $1,200 in January.[21] He also argues that he had discussed this with USPO Schmidt. USPO Schmidt testified that he had never approved Downey paying his restitution as a lump sum for the year.[22] The government argues that Downey is making restitution in bad faith, pointing to his apparent strategic timing of payments and that he had ample notice of the requirement to make monthly payments.[23]

---

[19] Dkt. 87 at 5.
[20] Dkt. 110 at 2.
[21] Dkt. 247 at 4–6.
[22] Dkt. 159 at 47:7–19.
[23] Dkt. 246 at 11–12.

The government also pointed to a Ninth Circuit memorandum opinion, where the panel had found that Downey was on notice of his requirement to make monthly payments.[24]

The government has established by at least a preponderance of the evidence that Downey violated Special Condition of Release 5 by failing to make monthly payments. First, there is no reading of this condition that would support any interpretation other than monthly payments. $1,200 is the minimum, but the amount owed could be higher if Downey's gross income for a month exceeded $1,000.[25] From an administrative standpoint, it would be difficult to prepay and then potentially make separate payments as necessary. His conditions of release provided for an easy-to-manage system of monthly payments, and Downey did not comply.

This Court reads Mr. Downey's argument to be that this is a de minimis departure from the condition and that the United States is not harmed by him paying a lump sum at the beginning of the year. While that is certainly an argument that can be raised for the purpose of determining judgment, it does not rebut the threshold determination that he has in fact violated this condition of release.

3.   Mr. Downey Traveled Outside of the District of Alaska Without Authorization from His USPO and Without Providing the Necessary Documentation.

Mr. Downey has not complied with Special Condition 6 or Standard Condition 3. Special Condition 6 reads, "[t]he defendant shall provide seven days advance notice, and all travel documents, for any requested travel outside the District of Alaska and shall obtain

---

[24] *See generally*, 155.
[25] Dkt. 87 at 5.

permission from U.S. Probation before leaving the district."[26]  Standard Condition 3 reads, "[y]ou must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer."[27]

Downey argues that he "believed [that he] was submitting all the requisite travel documents" to the USPOs.[28]  He disagrees with the apparent requirement of hard-copy itineraries, saying that it is not "meaningly different" that simply submitting his materials electronically, and that he was never told that his submissions were inadequate.[29]  As an initial matter, this Court defers to the USPO as to which travel documents are necessary, and in which form it needs them, before he can approve travel outside of the District. Disagreement with the severity of this infraction goes to the severity of the sanction justified by Mr. Downey's conduct, but not whether he violated this condition.

This Court finds that the government has established, by at least a preponderance of the evidence, multiple knowing violations of Mr. Downey's requirements to provide proper documentation to the USPO in advance of travel and obtaining its authorization prior to doing so.  As detailed *supra*, the government's witness spoke to Mr. Downey's repeated failure to obtain authorization prior to travel, and in several cases, travel outside of the requested dates and locations.  While Mr. Downey may plead ignorance when he was not

---

[26] *Id.* at 4.
[27] *Id.*
[28] Dkt. 247 at 4.
[29] *Id.* at 3.

Case 3:20-cr-00076-RRB-MMS   Document 251   Filed 11/06/24   Page 13 of 17

told that the USPO did not authorize a trip,[30] he cannot credibly rebut that he was acting in good faith when he blatantly traveled outside of his (unauthorized) request.

## III. DOWNEY'S SEPARATE ARGUMENTS

This Court will address Mr. Downey's separate arguments. For the reasons stated below, this Court is not persuaded by these ancillary matters.

### Chronological Records

On the second day of the evidentiary hearing proceedings, USPO Schmidt had reviewed some of his notes, or "chronos," to refresh his recollection regarding specific dates, whether certain requests were denied, and the reasoning behind those decisions. He did not read his notes into the record, and Downey had the opportunity to cross-examine him on this testimony.

Downey moved to compel these records. Dkt. 176. This Court denied that motion, finding that the United States Probation and Pretrial Services Office was not under the disclosure obligations applicable to the government due to its place within the judiciary. Dkt. 178. Downey then moved to strike USPO Schmidt's testimony under the Due Process Clause. Dkt. 184. This Court denied that motion, writing that although it could use its discretionary authority to compel production of these notes after an in camera review, such a request must be narrowly tailored to meet a specific factual dispute. Dkt. 189 at 5. Downey then moved to subpoena all of USPO Schmidt's chronos for him, which this Court denied because Downey had not tailored his request pursuant to its prior order. Dkt. 218.

---

[30] This Court finds that the duty to obtain authorization is on Mr. Downey, and a non-answer from the USPO constitutes not obtaining authorization.

This repeated request has been an ongoing fishing expedition. Downey did not present evidence contradicting the USPO, nor did he explain which testimony, if any, he disagreed with regarding the travel requests and whether they were approved. Even in his brief, Downey only argues that he "believe[s] that the Chronological Records related to [his] case would display that [he] was granted broader permission to travel than what has been conveyed in testimony." Dkt. 247 at 7. This too is merely a general objection which does not proffer any basis in fact, rather rests entirely on speculation. Without more, it cannot be a basis to disregard the record otherwise established.

**Alaska Airlines Records**

Downey also argues that the records from Alaska Airlines are without foundation. However, this Court heard testimony from SA Kinsler and argument from the parties regarding the admissibility and foundation of these materials. As such, while Downey may wish to attack the weight of the evidence, the government has still presented sufficient indication to convince this Court that Downey had traveled outside of the District by a preponderance of the evidence.

Downey also refers to Alaska Airlines materials that he has separately subpoenaed from the company. He has not received them, and while this Court is sympathetic to that matter, Downey has not demonstrated which, if any, trips that he believes were falsified by the witnesses or in need of clarification. He has not presented any conflicting evidence, such as a receipt reflecting a purchase in town, to contradict the dates that the government asserts that he was outside of the District. Accordingly, this Court does not see merit in this argument.

**His Conditions of Release Related to Travel**

Downey argues that his conditions of release pertaining to travel cannot be read together consistently. Dkt. 247 at 7. He had three conditions pertaining to travel:

> You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
> \*  \*  \*
> The defendant shall provide seven days advance notice, and all travel documents, for any requested travel outside the District of Alaska and shall obtain permission from U.S. Probation before leaving the district.
> \*  \*  \*
> The defendant is authorized to travel to Hawaii for the specific purpose of exercising his child visitation rights, only if the defendant remains in full compliance with his conditions, to include monthly payments towards restitution and a court order remains active for child visitation.[31]

This Court does not believe that these conditions are inconsistent with each other, and nevertheless, both USPO Astle and USPO Schmidt had discussed these conditions with Mr. Downey.[32] As such, this Court is not persuaded by this argument.

**References to his Religion and Selective Prosecution**

This Court does not find Mr. Downey's argument regarding discrimination on the basis of religion to be persuasive either. First, comments made by USPO Astle, which this Court does not expressly find as true as a factual matter, are not attributable to the prosecution. Second, this Court does not find the vague statement potentially made about a desire to "get" Downey to be wrongful in any event, especially when viewed against the exacting standard for whether the Court should sanction the government for selective

---

[31] *See*, Dkt. 87 at 4–5.
[32] Dkt. 159 at 6:15–8:7, 31:24–32:7; Dkt. 200 at 34:2–6.

prosecution. His arguments pertaining to the Missouri federal court proceedings are not appropriately made in this revocation proceeding.

## IV. CONCLUSION

For the reasons set forth above, the Court should find the allegations in the Petition to be substantiated and proceed to judgment. 28 U.S.C. § 636(b)(1)(B). This Court does not issue a recommendation on what judgment should be imposed.

DATED this 6th day of November 2024, at Anchorage, Alaska.

_____
MATTHEW M. SCOBLE
CHIEF U.S. MAGISTRATE JUDGE

Pursuant to D. Alaska Loc. Mag. R. 6(a), a party seeking to object to this proposed finding and recommendation shall file written objections with the Clerk of Court no later than the CLOSE OF BUSINESS on November 20, 2024. Failure to object to a magistrate judge's findings of fact may be treated as a procedural default and waiver of the right to contest those findings on appeal. *Miranda v. Anchondo*, et al., 684 F.3d 844 (9th Cir. 2012). The Ninth Circuit concludes that a district court is not required to consider evidence introduced for the first time in a party's objection to a magistrate judge's recommendation. *United States v. Howell*, 231 F.3d 615 (9th Cir. 2000). Objections and responses shall not exceed five (5) pages in length and shall not merely reargue positions presented in motion papers. Rather, objections and responses shall specifically designate the findings or recommendations objected to, the basis of the objection, and the points and authorities in support. Response(s) to the objections shall be filed on or before the CLOSE OF BUSINESS on November 27, 2024. The parties shall otherwise comply with provisions of D. Alaska Loc. Mag. R. 6(a). Reports and recommendations are not appealable orders. Any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's judgment. *See Hilliard v. Kincheloe*, 796 F.2d 308 (9th Cir. 1986).